UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MYRELL BERGERON                      CIVIL ACTION NO. 21-507

v

                                            JUDGE:    BROWN

LCMC                                        Magistrate Judge:   Roby

### AMENDED AND SUPPLEMENTAL
### COMPLAINT FOR FAILURE TO ACCOMMODATE, BATTERY, AND RETALIATORY TERMINATION

### Jurisdiction and venue

1. This action is brought under the ADA with respect to allegations of failure to accommodate plaintiff's disability and for retaliatory discharge. Jurisdiction is based on 28 USC sec. 1343. Venue in this district is proper because all conduct complained of occurred in this district.

2. Supplemental jurisdiction is alleged under the Louisiana Employment Discrimination Act, R.S. 23:323B(1)(2); the Louisiana Civil Rights for Handicapped Persons Act, R.S. 46:2251-56 with respect to failure to accommodate; and La CC Art 2315.

### Right to sue

3. Plaintiff filed an EEOC charge before June 23, 2020 and received a Right-to-sue letter on or about January 4, 2021.

### Parties

4. Plaintiff, Myrell Bergeron was at all relevant times 72-y.o while employed as nurse tech from March 2019 to April 22, 2020 (13 months) with a disclosed allergy to seafood. She was earning $13.50+/hr which with benefits was equal to $15.12/hr and worked a variable schedule.

5. Despite her disability (her seafood allergy) she had performed the essential functions of her position for defendant's predecessor corporation with a "no seafood" accommodation and did so for defendant, despite the regular

      introduction of seafood into the workplace over her objections, as long as she was able to preventively self-medicate.

6. Accordingly, plaintiff was a qualified individual.

7. Defendant, LCMC, is domestic corporation and employs over 500 people. At all relevant times it operated three urgent care clinics in particular, one at Algiers, where plaintiff was initially employed, one in Gretna, and one in Algiers.

8. Plaintiff worked first out of the Algiers clinic as her home clinic and then the Marrero clinic.

## Pertinent LCMC management employees

9. Nannette Young was the Regional Director of all urgent care clinics. When she was promoted, Pam Ballard replaced her. Marie Lambert was over employee health. They were both stationed in Baton Rouge. Jamie Malveaux was the HR Director who was terminated in about November 2019 and replaced by Nick Millet; they were also stationed in Baton Rouge.

10. Kathryn DiBenedetto was the LPH supervisor under Ms Young and was a roving supervisor who showed up at Marrero from time to time. Isis Guy is an African-American about 35 y.o. who was a lead person in Marrero promoted to the position of Clinical Director with responsibility for Marrero and Algiers. Isis did not work a strict shift, but would appear on multiple shifts it seemed on no fixed schedule.

## Background

11. LCMC is the successor to Dr Hector Cabrera who was a part owner of clinics at Marrero and Algiers. Dr Cabrera worked at both clinics as did plaintiff since 2017. In March 2019 Dr Cabrera and his partner sold them to LCMC . Plaintiff was rehired by LCMC and continued to work at both as a nurse tech.

12. While working under the ownership of Dr Cabrera, he was aware of her seafood problem and she had no allergic reactions. Seafood was prohibited; likewise, perfume.

13. The prohibition was enforced by Dr Cabrera's office manager, Wendy Lococo, particularly with respect to plaintiff and another employee who had a very severe allergy to perfumes.

14. Lococo did not continue employment with LCMC. She was replaced by Nannette Young.

15. About 2/3 of Cabrera's employees transferred to LCMC. Although they had not eaten seafood under Dr Cabrera, a number of them began to do so under LCMC. Chief among them were Katie Lagist and Moira Schmidt at Algiers; Isis Guy (Isis) at Marrero; and Dr Long who was back and forth between the Algiers and Marrero clinics.

16. When she on-boarded with LCMC plaintiff disclosed her allergy and asthma controlled with medication. This disclosure was made in both her on-boarding papers and orally to Ms Lambert on February 2, 2019. Plaintiff disclosed in her papers a prior worker's compensation claim for an allergic seafood reaction against her employer prior to Dr Cabrera.

17. At the first training session for new employees the weekend before beginning full time employment seafood po'boys were ordered for lunch. Plaintiff alerted Nannette Young that she was "deadly allergic" to seafood. Ms Young replied she forgot. Dr Charles Hasse, an employee of Dr Cabrera and familiar with plaintiff's allergy, was also on boarding and immediately ordered plaintiff to another room and closed the doors.

18. As a result of this incident, plaintiff began to premedicate herself every day before going to work.

### Count 1- Failure to accommodate seafood allergy[1]

19. Count 1 is brought under the ADA.

20. Despite this initial incident, employees, who had worked for Dr Cabrera and been prohibited from bringing in seafood, now under the new employer brought in and ordered seafood for lunch. One shift - the "seafood shift"- in

---

[1] Plaintiff abandons any allegations related to age or race.

particular brought in seafood.

21. Beginning in about March/April, plaintiff had a series of mild and moderate adverse reactions which she countered with her medications. She made Ms Lambert aware of all or most of these reactions. Plaintiff would state that she cannot touch or smell seafood: "My co-workers cannot sit at my desk and eat it or touch my computer because I am going to react to it."

22. While plaintiff was at Algiers Ms Young sent an email advising all employees Ms Bergeron was highly allergic to seafood and that if they ate it on the premises they had to sanitize where they had eaten.

23. However, Ms Lambert did not prohibit the seafood and advised she was trying to get an ADA accommodation that would save plaintiff's job. Because of the presence and risk of seafood plaintiff would pre-medicate at home with medicines to prevent a allergic reaction. Her pharmacy (Chateau Drugs on West Esplanade) expenses for these medicines increased.

24. At this same time she began to have mild to moderate panic attacks once or twice a week.

25. The seafood situation was so bad that on August 4 plaintiff asked for a transfer to the Gretna clinic.

26. On September 13, 2019 (Friday) seafood was brought in for lunch, but this time plaintiff had a serious reaction for which she saw Dr Swift at Ochsner Occupational Medicine at the instruction of LCMC's compensation adjuster, Terri Hoover. He wrote: "No exposure to seafood, including heating or cooking of seafood." He repeated this instruction.

27. She also saw Dr Borgman on September 16. He disabled her for that day. He transmitted to defendant recommendations which are not known at this time.

28. On Monday plaintiff texted Ms Lambert about Friday's adverse reaction and returned to work on Tuesday, September 17. However, seafood was again brought in. Somehow Ms Young learned of this and contacted Ms Lambert who called plaintiff and told her to leave work.

29. On September 18, Ms Lambert gave plaintiff ADA paperwork to be completed by Dr Borgman who did so on September 25. He stated plaintiff could perform her duties- she is highly allergic to seafood.

30. On September 22 plaintiff presented to the ER at Ochsner Baptist which discharged her with strict return precautions to avoid seafood.

31. On September 27 she was exposed to seafood and was again treated at Ochsner.

32. At about this time defendant's LCMC investigated her complaints; the results are unknown.

33. On or about October 1 plaintiff found her jar of peanut butter in the refrigerator had been contaminated with a spoon and it smelled like sardines.

34. By October 4, she had been to medical providers the last of which disabled her until October 11 with instructions to stay away from seafood.

35. On October 16, plaintiff requested an ADA form to transfer from the Algiers clinic. This followed up a request to be transferred to Gretna on August 3.

36. On October 21 the employer's doctor (Swift) again discharged her with instructions of "no seafood including heating or cooking of seafood" and referred her to the instructions of Dr Borgman. This information was sent to her employer.

37. At an October 28, 2019 meeting, attended by Ms Malveaux, Ms Young advised it had effected an ADA accommodation in the form of a sign at the Marrero clinic that read "SEAFOOD PRESENT." Plaintiff objected that this would not prevent exposure to seafood odors; Ms Young replied this was all LCMC had to in order to protect her.

38. At this meeting, plaintiff again asked for a transfer the Gretna clinic on the West Bank where she had noticed co-employees did not eat seafood as often as the Marrero employees and where she had worked successfully before. Malveaux and Young replied they were working on it.

39. Ultimately, her request was denied because there was seafood restaurant next to the Gretna clinic.

40. On November 17 plaintiff was exposed to a strong bathroom chemical cleaner that caused an asthma attack.

41. On November 21 she saw her pulmonogist, Dr Om Garg, in the company of a compensation Nurse Case Manager, Jenifier Baham. Dr Garg diagnosed several asthmatic related conditions and instructed her to avoid seafood.

42. Plaintiff was transferred to the Marrero clinic shortly after Thanksgiving. She finished up at Algiers and started at Marrero while sick. By the time she transferred to Marrero a no "SEAFOOD PRESENT" sign had been posted at the Algiers clinic.

43. However, in the few day she worked at Marrero before becoming more sick (see below) she did see such a sign posted internally, but cannot remember if she were exposed to seafood. She defers to contemporaneous medical records.

44. Her seafood problem was worse at Algiers than at Marrero. At Algiers it seemed employees ate seafood almost every time she worked; at Marrero the frequency was about 3/4 as compared to Algiers. At Algiers under Dr Cabrera she had no panic attacks related to work. However, under LCMC when she began to be exposed to seafood, she started having them. She had her worst attacks after the seafood incident of September 13. She continued to have them at Marrero. At Algiers she rarely saw Isis, but knew of her by reputation.

45. On November 22, 2019 she went to Ochsner Baptist ER for a seafood reaction.

46. On November 23, 2019 she was exposed to chemicals while cleaning a bathroom.

47. She was seen at Touro Infirmary for both conditions on November 24, 25 and 27 when she was admitted.

48. By November 27, plaintiff, still assigned to Algiers as her home clinic, presented to the Tuoro ER which admitted her and disabled her for two weeks until December 12, 2019.

49. At about this time - plaintiff is not sure of this date - Pam Ballard, the new Regional Director (wearing a camel cape and brown slacks), met with all employees at the Gretna clinic where plaintiff was filling in. Plaintiff expressed to Ballard her need not to work around seafood, seafood odors, etc. Ballard said LCMC would look into her concerns and see what they could do. Ballard took notes on yellow legal pad.

50. Before she left Ms Ballard remarked in response to plaintiff's seafood complaint that she "lived in the wrong state" and "needed to move." The conversation occurred in a private office over the course of about 1 1/4 hours; there were no witnesses. Ballard did not get back to her directly.

51. On December 19 plaintiff with Ms Baham saw Dr Garg who diagnosed her with walking pneumonia. He released her for work with instructions to have "no contact with seafood." These restrictions are shown in Dr Garg 's RTW slip.

52. When plaintiff came back to work from being hospitalized at Tuoro she returned to the Marrero clinic and saw signs stating SEAFOOD PRESENT posted inside. Employees were eating seafood as before.

53. Plaintiff began a series of complaints to Ms Lambert that Isis Guy would not give her a seafood accommodation. Some were by phone and email. Some complaints were also that Isis was a "bully."

54. At some point in this time Isis came to plaintiff's desk and exclaimed that she wanted her clinic's patient numbers up because that was "how she got her f'g coin." "If nobody wanted to work, she could cut their throat and get rid of them. She knew how to do it and not get caught." Dr Simpson may have been present, but was typing. Toby Savoie or Rebecca Kerner may have been present in and out.

55. On December 27, 2019 plaintiff emailed Amy Ferguson, at the Hartford (her comp insurer), a note from Dr Borgman.

56. On January 5, 2020 plaintiff was at the Marrero clinic. Isis was the lead person and was soon formally promoted to manager of Algiers and Marrero.

57. As plaintiff reported for the 2 pm shift, she saw Guy posting a sign stating "SEAFOOD PRESENT." She had removed it from inside and was now posting it outside facing the parking lot from which employees entered to clock in.

58. When plaintiff entered she saw Kristin Lacompte (supervisor of front desk employees) wiping down the kitchen/dining room table after it had been used by the shift before. Lacompte closed the door and told her not to enter - she was scrubbing the table down.

59. Plaintiff asked why the previous shift would bring in seafood knowing plaintiff was coming in to work. Lacompte replied, "They didn't give a damn...They were going to eat their seafood."

60. Plaintiff sat at her desk, but could smell the seafood. As a possible precaution she wiped down her desk, but began to have an allergic reaction. She called Ms Lambert in Baton Rouge. Plaintiff had medicated herself as before. Lambert told her to see Pelican State Outpatient Center because she did not trust Ochsner Urgent Care.

61. Later plaintiff was able to see Pelican where she saw Dr Steen who allowed her to RTW with the strict instruction that she "must work in a seafood free environment." Dr Steen's emailed this RTW slip to Ms Lambert.

62. Ms Lambert acknowledged receipt, but never discussed Dr Steen's RTW note with plaintiff.

63. Two days later she saw Dr Borgman for a routine follow up; she was symptomatic. He instructed her to "avoid crawfish exposure." She did not relay this restriction to LCMC.

64. On February 5, 2020 plaintiff left a voicemail (and may have repeated the information in an email) for Ms Lambert that she was ok; was again instructed not to be around seafood; and was seeing Dr Shiva Akula later that day.

65. Following that appointment she emailed her that Dr Akula believed she may be suffering from an infection.

66. On February 8, 2020 plaintiff emailed Ms Lambert that Nick Millet, the new HR director in Baton Rouge, wanted to talk to her about the seafood issue. Plaintiff advised she had been ridiculed by Moria Schmidt, a co-employee x-ray tech at Algiers, in a text. (See September 21, 2019.) Ms Schmidt said plaintiff should never have reported the matter to HR, had gotten Nannette Young into difficulty, and would lose her job. On February 10 Ms Lambert advised she would get Nick up to speed..

67. On February 28, plaintiff emailed Ms Lambert that Dr Garg wanted her off work at home and on medication in order that she could work the weekend without difficulty. Plaintiff also advised she had requested Pam Ballard (the new Regional Administrator replacing Young who was promoted) to change her schedule from Fridays to another day during Lent, but that the request was denied unless she could get someone to swap with her. Plaintiff could not find a swap.

68. Sometime in February Isis threatened that if employees did not start unpacking supplies she was "going to write their ass up and "cut their throats by cutting their hours. She implied she could get people fired.

69. By March 4, 2020 plaintiff had retained an attorney and filed a worker's compensation claim. At about this time, Ms Baham, the Nurse Case Manager, wrote Ms Lambert and the Hartford that plaintiff should be removed from the LCMC environment because she would never get better if she stayed there.

70. On March 5, 2020 Isis accused plaintiff of entering the Marrero building with an unauthorized key. Isis was very angry and stated she was "Isis, the terrorist." Plaintiff thought Isis would strike her. She had chest pains and other symptoms for which she was Dr Garg who disabled her until March 16.

71. On March 6, she was Dr Borgman . He noted she was positive for cough and expectoration of green sputum. On March 13, he wrote LCMC that plaintiff should not return to work until there was a seafood accommodation.

72. A few days before March 15 plaintiff again inquired about the Gretna position which she had first sought in August, 2019. In December/January Ms Ballard told plaintiff she did not have to apply for the job; she could have it.

73. However, plaintiff heard nothing about getting the job and then heard through a co-employee that someone else had gotten the position. That person was Mel LNU, about 30 y.o, with less experience. Plaintiff had told Ms Ballard she had worked there intermittently and had never had an adverse reaction there.

74. On about March 15, plaintiff met with Ms Ballard and Nick Millet at LCMC HQ in Baton Rouge. She had sent them medical papers documenting her seafood allergies and need for an accommodation. She repeated these concerns at the meeting which she taped. She again asked for a transfer to Gretna for two reasons related to Isis - she was a bully and would not accommodate her seafood allergies, but LCMC denied the request in later letters.

75. On March 17, 2020 Millet emailed plaintiff LCMC was uncertain it could accommodate her request not to work under Isis. Ms Ballard emailed her denying her request to transfer from Isis' supervision and for relief from exposure to seafood.

76. Within two days plaintiff noticed that she was getting the cold shoulder from Isis and dismissive treatment.

77. After plaintiff was terminated she was advised by Toby Savoie, a former employee, on at least three occasions that Ms Savoie had heard Isis on more than one occasion state that she was going to get rid of plaintiff. Ms Savoie dated these statements from late February to early March. Ms Savoie also reported that Isis had made these statements in front of other unnamed employees. She did not mention why Isis wanted to get rid of plaintiff..

78. On March 18, 2020, plaintiff volunteered to Ms Lambert that she could call Dr Garg at his office about plaintiff's high allergy to seafood and her need to leave the building when it was brought in. He was confused why LCMC appeared not to understand her allergy.

79. To plaintiff's knowledge Ms Lambert did not call Dr Garg.

80. On March 27, 2020 plaintiff was treated by Dr Sherie Godbey for a severe panic attack at work and diagnosed with related PTSD and anxiety.

81. On a Saturday after the Baton Rouge meeting, plaintiff saw Dr Peter Nguyen at the Gretna clinic for a knee discomfort. In the course of that examination, he told her directly that LCMC would "get her." He did not state why.

82. Seafood continued to appear at lunch on the "seafood shift" at the Marrero clinic. Plaintiff, using her daily medications before work and taking them during the day, continued to have mild to serious reactions, but her lung and other respiratory problems never disappeared (she continued to cough up blood and sputum) and they got worse.

83. Plaintiff occasionally exclaimed to Isis that she was "sick of this seafood." Isis would roll her eyes.

84. Plaintiff also continued to report most, tho' not all, seafood events to Ms Lambert mostly by phone, but sometimes by email. Plaintiff would include Isis' lack of seafood accommodation in her complaint to Ms Lambert.

85. On April 2, 2020 plaintiff smelled seafood and self-administered a shot of Epi.

86. On April 3, 2020 plaintiff was at the Marrero clinic when employees brought in seafood. Plaintiff self-treated, but stopped reporting seafood events to Ms Lambert because she had gotten no relief from her requests for a "seafood accommodation."

87. On April 7, 2020 LCMC received a regular shipment of PPE (N-95 masks). The normal procedure was for any available employee to unpack the masks, etc. and put them on the shelves. Employees would take masks as needed. On this occasion the small box of masks was not unpacked, but was left stacked on two big boxes on the floor of the dining room. Plaintiff needed a mask and went looking for one in the afternoon. She found the small box, opened it, took out a pack of five, took one to replace a bloody mask (still on hand), two-three spares which she put in her purse which was in her

medicine bag, and handed out masks to two employees - five in all. This was all video taped.

88. Isis was in charge of the masks, but to plaintiff's knowledge, never required any one to get permission before taking a mask.

89. In the morning, plaintiff had seen Katie Lagaste take a similar pack of masks from a locked cabinet (or the safe inside it) and, to the best of her recollection, put them in her drawer. Plaintiff does not know if management was aware of Ms Lagaste's taking the pack of masks, but she would have been videoed.

90. Later, after plaintiff had gotten the masks, Isis went to the box, came to plaintiff's desk and stated, "I need these masks! Where are the masks?" Apparently she was referring to masks that were missing from the open box.

91. Plaintiff stated she had them and gave three back to her. Isis demanded, "Where are the rest of them?" Plaintiff replied. "This is all I have. I'll go look for them"(meaning the two she had given to staff). Plaintiff did not track down the two she gave away, but otherwise returned all the masks.

92. The foregoing is alleged to constitute multiple failures to accommodate plaintiff's seafood disability.

92A. The foregoing is alleged to constitute an intentional tort of exposing plaintiff to a substance - seafood odor -the result of which exposure was an adverse reaction known to be substantially certain to follow.

## Count 2 - Failure to accommodate

93. Count 2 is brought under the Louisiana Employment Discrimination Law and the Louisiana Civil Rights for Handicapped Persons Act. All the foregoing is re-alleged here.

## Count 2A - Intentional Tort of Battery

93A. Count 2A is brought under La CC Art 2315 and alleges the tort of battery with consequential physical, and disabling damage to plaintiff's lungs; physical and emotional pain and suffering; mental anguish; inconvenience; loss of enjoyment of life; and other damages.

## Count 3 -Retaliatory termination

94. Count 3 is brought under the ADA.

95. Fifteen days later on April 22, 2019 (five weeks after plaintiff's Baton Rouge complaint) Nick Millet, Katie DiBenedetto, and Ballard arrived and told plaintiff she would have to be terminated because she had "broken a rule by taking a mask. People get fired by this company for stealing." They stated she was shown on the video putting the masks in her purse in her medicine bag which was in her desk. Ballard told her that Isis had told them she had stolen masks. Nothing was mentioned about stealing 500 masks.

96. However, prior to plaintiff's taking three masks for her work use she had noticed Isis on three occasions taking large boxes and putting them in trunk of her car. Medicine and masks came in smaller boxes, so these larger boxes apparently contained gowns or sheets. Each clinic got its own shipment of these supplies.

97. The Marrero clinic would get in shipments of gowns and masks, but the entire shipment would be gone in a couple of days - there would be nothing left - and plaintiff had to wear a dirty mask on more than one occasion.

98. About a week after plaintiff was terminated, Rebecca Kerner called her to state that Isis had made her unpack a box masks and put them up. However, that same day Ms Kerner saw Isis putting the masks back in the same box and walk out the door with the box.

99. All of Isis' leaving with boxes would, like plaintiff's "theft", have been videoed.

100. The termination meeting lasted about 20 minutes and the three company managers did most of the talking. Plaintiff was told to "gather her things and leave immediately."

101. As she left the pharmacy next door where she went to calm down and wait for her husband to pick her up, she saw DiBennetto, Ballard, and Isis standing by the COVID trailer, laughing, and looking toward her husband and her.

102. Plaintiff alleges the stated termination reason is pretext and that she was fired at the instigation of Isis Guy for having complained at Baton Rouge on March 15 about her failure to accommodate her seafood allergy.

## Relief sought

### Under Count 1- Lack of accommodation (federal)

103. Plaintiff seeks back and front pay and compensatory and punitive damages under 42 USC sec 1981(a) (2) in addition to any other relief available under the Civil Rights Act of 1964.

### Under Count 2 - Lack of accommodation (state)

104. Plaintiff seeks back and front pay and compensatory damages.

### Under Count 2A - Battery (state)

104A. Plaintiff seeks all compensatory damages and any loss of pay because of reduced employment opportunities due to her disability (as opposed to her allergy).

### Under Court 3 - Retaliatory Termination (federal)

105. Plaintiff seeks back and front pay. 42 USC 12117.

106. Under all counts as applicable plaintiff seeks all legal and equitable relief, compensatory damages, trial by jury, expert and other court costs, attorney fees, and trial by jury.

Respectfully submitted,
/s/ J Courtney Wilson
J Courtney Wilson 13561
1510 Veterans Blvd
Metairie, La 70005
(T) 504/832-0585
(F) 504/846-2400

Charlsey J Wolff LB# 17869
2800 Veterans Memorial Blvd
Ste 204
Metairie LA, 70002
Phone: (504) 483-3406
Fax: (504) 229-7702