**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **MYRELL BERGERON** | **CIVIL ACTION** |
| **VERSUS** | **NO. 21-507** |
| **LCMC URGENT CARE, LLC** | **SECTION: "G"** |

## ORDER AND REASONS

Plaintiff Myrell Bergeron ("Bergeron") brings this litigation against Defendant LCMC Urgent Care, LLC ("LCMC") arising out of LCMC's alleged failure to accommodate Bergeron's seafood allergy.[1] Before the Court is LCMC's "Motion for Summary Judgment."[2] Bergeron opposes the motion.[3] Having considered the motion, the memoranda in support and in opposition, the record, and the applicable law, the Court grants the motion in part and denies it in part.

## I. Background

On March 12, 2021, Bergeron filed a Complaint in this Court.[4] On August 11, 2021, with leave of Court, Bergeron filed an Amended Complaint.[5] In the Amended Complaint, Bergeron alleges that she worked as a nurse technician for LCMC from March 2019 to April 22, 2020.[6] Prior to that, Bergeron alleges that she worked for Dr. Hector Cabrera ("Dr. Cabrera"), who later sold

---

[1] Rec. Docs. 2, 11.

[2] Rec. Doc. 32.

[3] Rec. Doc. 35.

[4] Rec. Doc. 2.

[5] Rec. Docs. 10, 11.

[6] Rec. Doc. 11 at 1.

1

his clinic to LCMC.[7] Bergeron avers that during her employment prior to LCMC taking over, Dr. Cabrera was aware that she was allergic to seafood, and that seafood was prohibited at the workplace.[8] Bergeron alleges that this prohibition was enforced by Dr. Cabrera's office manager Wendy Lococo, who was replaced by Nannette Young ("Young") when LCMC purchased the clinic.[9] Bergeron further alleges that about two thirds of Dr. Cabrera's employees "transferred to LCMC," and began to eat seafood at work under this new management.[10] Bergeron avers that she disclosed her allergy to LCMC during the onboarding process, both in documents and orally to Marie Lambert ("Lambert"), who was in charge of employee health.[11]

Nevertheless, Bergeron avers that LCMC did not accommodate her seafood allergy. Bergeron alleges that she had a number of allergic reactions due to employees bringing seafood to work.[12] She alleges that she informed Lambert about most of these reactions.[13] In particular, Bergeron avers that she had a serious allergic reaction on September 13, 2019, after seafood was brought in for lunch.[14] She avers that she saw several doctors for this reaction, one of whom instructed that she should not be exposed to seafood.[15] Bergeron asserts that after she informed

---

[7] *Id.* at 2.

[8] *Id.*

[9] *Id.*

[10] *Id.* at 3.

[11] *Id.*

[12] *Id.* at 3–4.

[13] *Id.*

[14] *Id.* at 4.

[15] *Id.*

Lambert about this reaction and returned to work on September 17, seafood was brought in again.[16] Bergeron alleges that Young, the then-regional director, was aware of this and instructed Bergeron to leave work.[17] Bergeron avers that the next day, Lambert gave her "ADA paperwork" to be completed by her doctor.[18]

Bergeron alleges that on October 28, 2019, she attended a meeting with Young and Jamie Malveaux ("Malveaux"), LCMC's HR Director, where she was informed that LCMC had adopted an accommodation in the form of a sign alerting her whenever seafood was present in the office.[19] When Bergeron objected that this would not prevent exposure to seafood odors, Bergeron alleges that Young "replied [that] this was all LCMC had to do in order to protect her."[20] At this same meeting, Bergeron alleges that she requested a transfer to a clinic in Gretna where employees did not eat seafood as often, but that LCMC ultimately denied this request because there was a seafood restaurant next door to this clinic.[21] Nevertheless, she contends that she was later transferred to a clinic in Marrero.[22] Bergeron alleges that she continued to have reactions to seafood at the Marrero clinic.[23] She alleges that she was hospitalized at Touro Infirmary in November 2019 after being

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.* at 5.

[20] *Id.*

[21] *Id.* at 5–6.

[22] *Id.* at 6.

[23] *Id.*

exposed to seafood and chemicals at the Marrero clinic.[24] Upon her return to work, Bergeron avers that employees continued to eat seafood, but that she noticed signs stating "SEAFOOD PRESENT."[25]

Bergeron alleges that on January 5, 2020, she saw Icessis Guy ("Guy") posting the "SEAFOOD PRESENT" sign, and another employee, Kristin Lacompte ("Lacompte"), wiping down the kitchen table.[26] Bergeon avers that when she asked Lacompte why the other employees ate seafood knowing she was coming in, Lacompte replied "[t]hey didn't give a damn . . . [t]hey were going to eat their seafood."[27] After this interaction, Bergeron alleges that she had an allergic reaction and sought treatment at Pelican State Outpatient Center.[28] Bergeron avers that her treating physician emailed Lambert with an instruction that Bergeron must "work in a seafood free environment."[29]

Bergeron also alleges that she had numerous issues with Guy, her supervisor. Bergeron alleges that she had made "a series of complaints" to Lambert that Guy would not accommodate her seafood allergy, and that she was a "bully."[30] Bergeron avers that Guy once came up to her desk and stated that "[i]f nobody wanted to work," Guy "could cut their throat and get rid of

---

[24] *Id.*

[25] *Id.* at 7.

[26] *Id.* at 8.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.* at 7.

them."[31] Bergeron further avers that on March 5, 2020, Guy accused her of entering the Marrero clinic with an unauthorized key.[32] She alleges that she again requested a transfer to the Gretna clinic because Guy "was a bully and would not accommodate her seafood allergies."[33] She asserts that this request was ultimately denied, and that she was "getting the cold shoulder" and "dismissive treatment" from Guy.[34] For example, she avers that when she occasionally mentioned to Guy that she was "sick of this seafood," Guy would roll her eyes.[35] She further avers that after she was fired, another former employee told her that Guy had stated on several occasions that she was going to "get rid" of Bergeron.[36]

Bergeron alleges that on April 7, 2020, LCMC received a shipment of N-95 masks.[37] She asserts that the "normal procedure" was for any employee to unpack the masks so employees could take them as needed.[38] Bergeron alleges that when she needed a mask, she took out a pack of five masks.[39] She avers that she used one to replace a bloody mask she was using, put "two-three spares" in her purse, and then "handed out masks to two employees."[40] Later, Bergeron alleges

---

[31] *Id.*

[32] *Id.* at 10.

[33] *Id.*

[34] *Id.*

[35] *Id.* at 11.

[36] *Id.* at 10.

[37] *Id.* at 11.

[38] *Id.*

[39] *Id.*

[40] *Id.* at 11–12.

that Guy noticed the missing masks and stated that she needed them.[41] Bergeron avers that she responded by giving three of the masks back to Guy, and went to look for the two she had given to other employees.[42] Bergeron alleges that fifteen days later, she attended a meeting with Nick Millet ("Millet"), Katie DiBenedetto ("DiBenedetto"), and Pam Ballard ("Ballard"), where she was told that her employment was being terminated because she took masks.[43] She alleges that while waiting to be picked up by her husband, she saw DiBenedetto, Ballard, and Guy laughing at her.[44]

Based on these allegations, Bergeron asserts the following claims: (1) failure to accommodate her seafood allergy under the Americans with Disabilities Act ("ADA"), the Louisiana Employment Discrimination Law, and the Louisiana Civil Rights for Handicapped Persons Act (Count 1); (2) battery (Count 2); and (3) retaliation under the ADA (Count 3).

On March 22, 2022, LCMC filed the instant "Motion for Summary Judgment."[45] On March 29, 2022, Bergeron filed an opposition.[46] On April 8, 2022, with leave of Court, LCMC filed a reply.[47]

---

[41] *Id.*

[42] *Id.*

[43] *Id*. at 13.

[44] *Id.* at 14.

[45] Rec. Doc. 32.

[46] Rec. Doc. 35.

[47] Rec. Docs. 40, 41.

## II. Parties' Arguments

*A.*    ***LCMC's Arguments in Support of the Motion for Summary Judgment***

LCMC argues that it is entitled to summary judgment on all of Bergeron's claims.

### 1.  Failure to Accommodate

First, LCMC argues that it is entitled to summary judgment on Bergeron's failure to accommodate claim.[48] LCMC contends that under the ADA, Bergeron must show that: (1) she is a qualified individual with a disability; (2) the disability and its limitations were known by LCMC; and (3) LCMC failed to make reasonable accommodations for those limitations.[49]

LCMC first argues that Bergeron's disability and its limitations were not known by LCMC until the September 2019 incident when she requested an accommodation for the first time.[50] LCMC contends that Bergeron "successfully worked without an accommodation (and without requesting an accommodation) for her seafood allergy from the date of her hire in February 2019 until September 2019."[51] Thus, LCMC argues that its duty to provide an accommodation was not triggered until the incident on September 13, 2019.[52]

Once LCMC knew of her disability and its limitations, LCMC contends that it provided reasonable accommodations in compliance with the ADA.[53] LCMC highlights that after the September 13 incident, Young interviewed witnesses and completed an incident report, and

---

[48] Rec. Doc. 32-1 at 11.

[49] *Id.*

[50] *Id.* at 12.

[51] *Id.*

[52] *Id.*

[53] *Id.*

Lambert gave Bergeron paperwork for her healthcare provider to complete.[54] LCMC further notes that upon receipt of the completed paperwork, it identified and implemented reasonable accommodations.[55] According to LCMC, these accommodations included instructing employees not to consume seafood around Bergeron, to sanitize any areas that came into contact with seafood, and to post signs whenever seafood had been present in the breakroom.[56] LCMC contends that "[a]t the time, Bergeron was consulted and agreed to the proposed accommodation."[57]

LCMC argues that in the following six months, there was only one other seafood-related incident, which occurred on January 15, 2020.[58] LCMC contends that seafood had been present in the office on the day before Bergeron was scheduled to work, but it was confined to the conference room and was subsequently sanitized.[59] LCMC further argues that the signs indicating that seafood had been present were put up, and that Bergeron was notified prior to her arrival.[60] LCMC contends that if Bergeron had any symptoms related to this exposure, they were "not severe in nature, given that Bergeron worked the full day" and "waited almost a week after the potential exposure to even seek medical treatment."[61]

---

[54] *Id.*

[55] *Id.*

[56] *Id.* at 12–13.

[57] *Id.* at 13.

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

LCMC contends that the ADA does not require "the best" accommodation or the employee's preferred accommodation, but only one that is "sufficient to meet the job-related needs of the individual being accommodated."[62] LCMC argues that there is no evidence that the accommodation did not allow Bergeron to perform her job duties.[63] Therefore, LCMC contends that it is entitled to summary judgment on her failure to accommodate claim.

### 2. Retaliation

Second, LCMC asserts that it is entitled to summary judgment on Bergeron's retaliation claim.[64] LCMC argues that to establish a prima facie case of retaliation, Bergeron must show that (1) she participated in a protected activity; (2) LCMC took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action.[65] LCMC further argues that if Bergeron makes a prima facie case, the burden shifts to LCMC to provide a non-retaliatory reason for any such adverse employment action, after which Bergeron must demonstrate that this reason was pretextual.[66]

LCMC argues that Bergeron has not stated a prima facie claim for retaliation because there is no causal connection between any protected activity and Bergeron's termination.[67] LCMC argues that it is not sufficient that an adverse employment action is taken after an employee

---

[62] *Id.*

[63] *Id.*

[64] *Id.* at 14.

[65] *Id.*

[66] *Id.*

[67] *Id.*

engaged in some protected activity.[68] LCMC contends that there is "no competent evidence" to suggest that Millet or Ballard had an "improper motive" when they terminated Bergeron's employment "following a separate incident involving Bergeron indisputably taking N-95 masks she knew to be in critically short supply for her own personal use."[69]

Alternatively, LCMC argues that it has a legitimate, non-retaliatory reason for terminating Bergeron's employment: Bergeron had taken LCMC's N-95 masks for her own personal use.[70] LCMC argues that Bergeron admitted taking the masks and lying to Millet and Ballard about it.[71] Thus, LCMC contends that this was a legitimate, non-retaliatory reason for terminating her employment.[72]

LCMC contends that Bergeron cannot demonstrate that this reason was pretextual.[73] LCMC argues that there is no evidence that Bergeron was treated differently than any other employee, and notes that other employees have been terminated for instances of theft.[74] LCMC further argues that there is no evidence that this offered reason is "false or unworthy of credence," and that Bergeron's subjective belief that it is pretextual is insufficient to defeat summary judgment.[75]

---

[68] *Id.*

[69] *Id.* at 15.

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id.* at 16.

[74] *Id.*

[75] *Id.* at 16–17.

### 3. **Battery**

Lastly, LCMC argues that it is entitled to summary judgment on Bergeron's battery claim for several reasons.[76] First, LCMC contends that the claim is prescribed because it was not filed within one year of any incident that could constitute a battery.[77] LCMC argues that the Amended Complaint is vague as to what incident constituted a battery, but nonetheless argues that the only possible incidents occurred in September 2019 and January 2020.[78] Because the Complaint was not filed until March 2021, LCMC argues that the battery claim is prescribed.

LCMC further argues that, even if the claim were not prescribed, there is no evidence that any individual intended for Bergeron to come into contact with "seafood odor."[79] LCMC contends that absent any intent to cause a "harmful or offensive" contact, Bergeron's battery claim fails.[80]

Finally, LCMC contends that it cannot be vicariously liable for any battery committed by its employees.[81] LCMC argues that to the extent Bergeron's exposure to "seafood odor" could constitute a battery, the employees that brought in seafood did not do so for LCMC's benefit, nor was it within any of the employees' assigned duties.[82] Therefore, LCMC argues that it cannot be vicariously liable for any battery based on exposure to seafood odor.[83]

---

[76] *Id.* at 17.

[77] *Id.*

[78] *Id.* at 18.

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] *Id.*

**B.**     *Bergeron's Arguments in Opposition to the Motion*

**1.**      **Failure to Accommodate**

Bergeron argues that there is a genuine dispute of material fact regarding whether LCMC reasonably accommodated her disability.[84] Bergeron notes that LCMC concedes the first prong of her ADA claim, that she was a qualified individual with a disability.[85] As to the second prong, whether LCMC knew of the disability and its limitations, Bergeron argues that she disclosed her seafood allergy in hiring documents that were signed by Lambert on February 22, 2019.[86] Bergeron contends that she also disclosed a prior worker's compensation claim for exposure to seafood.[87] Bergeron further argues that she reported her allergy to Young at a training event in February 2019.[88] Thus, Bergeron contends that these disclosures "triggered [LCMC's] duty to engage in the interactive process—as they knew she had been previously injured as a result of seafood exposure."[89] Bergeron further argues that her allergy was "open and obvious."[90]

Bergeron contends that she was injured on September 13, 2019, due to exposure to seafood at LCMC.[91] Following this incident, on September 16, 2019, Bergeron asserts that she texted Young stating that she is "severely allergic to shellfish" and that her doctor provided a note

---

[84] Rec. Doc. 35 at 6–7.

[85] *Id.* at 6.

[86] *Id.* at 7.

[87] *Id.*

[88] *Id.* at 8.

[89] *Id.*

[90] *Id.*

[91] *Id.*

instructing her to stay away from seafood.[92] Bergeron contends that she received a similar note from Dr. Borgman, dated September 16, 2019, which she provided to LCMC, and LCMC then "requested an ADA Certification Form."[93] Thus, Bergeron argues that by September 16, 2019, LCMC knew of her disability and its limitations.[94]

Bergeron argues that LCMC's accommodations were not reasonable because they failed to work.[95] Bergeron argues that it is ordinarily for the trier of fact to decide whether an accommodation is reasonable, and therefore it is not an inquiry that should be decided on a motion for summary judgment.[96] Bergeron further argues that there are "sufficient facts beyond merely colorable claims that LCMC failed to engaged in the interactive process."[97] Bergeron argues that LCMC's accommodations "still allowed employees to eat seafood while [she] was working as long as a sign stating 'SEAFOOD PRESENT' was up."[98] Bergeron contends that there were never any other discussions regarding other possible accommodations, and that Malveaux told her that this accommodation was "all they could do."[99]

---

[92] *Id.*

[93] *Id.* at 9.

[94] *Id.*

[95] *Id.* at 10.

[96] *Id.*

[97] *Id.*

[98] *Id.*

[99] *Id.* at 11.

Bergeron argues that an employer's unwillingness to engage in a good faith interactive process constitutes a failure to reasonably accommodate an employee.[100] She contends that the interactive process "requires the input of the employee as well as the employer."[101] Bergeron contends that after the accommodations were granted and Bergeron had additional seafood exposures, LCMC failed to reexamine these accommodations or participate in any interactive process.[102]

Bergeron argues that following exposures on January 15, 2020 and February 21, 2020, which resulted in severe reactions, she reported the incidents to LCMC employees.[103] Nevertheless, Bergeron contends that there is no evidence that LCMC discussed making changes to the accommodation after these incidents.[104] Bergeron contends that these subsequent exposures and LCMC's failure to change the accommodation create a dispute of fact as to whether the accommodation was reasonable.[105]

---

[100] *Id.* at 12.

[101] *Id.*

[102] *Id.* at 12–13.

[103] *Id.* at 13–14.

[104] *Id.*

[105] *Id.* at 15.

2.      **Retaliation**

Next, Bergeron argues that LCMC is not entitled to summary judgment on her retaliation claim.[106] She asserts that LCMC concedes that she participated in a protected activity and that her termination constituted an adverse employment action.[107]

Bergeron argues that her reporting of her exposures to seafood was causally connected to her termination.[108] Bergeron cites *Zamora v. City of Houston* for the proposition that this element can be satisfied by demonstrating that a supervisor's influence with the decisionmaker was strong enough to cause the adverse employment action.[109] Bergeron contends that Guy was her supervisor, and was also in charge of monitoring accommodations.[110] Bergeron argues that she made complaints about Guy's handling of her reports.[111] She further argues that Guy made "negative comments about [Bergeron] because of her seafood restrictions" and another employee witnessed Guy's "disregard and/or annoyance for Bergeron's seafood accommodations."[112] Thus, Bergeron contends that Guy had a retaliatory animus toward her due to her seafood allergy.

Bergeron further argues that Guy caused her termination by calling HR representative Ballard to report that Bergeron had stolen masks.[113] Bergeron further argues that this allegation

---

[106] *Id.* at 16.

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *Id.*

[111] *Id.* at 17.

[112] *Id.*

[113] *Id.*

that she stole the masks is "tenuous at best," as there was no limit on the number of masks one could take.[114] Bergeron points to her deposition testimony where she stated that she took the masks to use at work, rather than for personal use.[115] Bergeron argues that had Guy not alleged that she stole masks, she would not have been fired, and thus there is a dispute of fact as to whether her termination was causally related to her complaints about seafood exposure.[116]

### 3.    Battery

Finally, Bergeron contends that LCMC is not entitled to summary judgment on her battery claim. First, Bergeron contends that the last seafood exposures were on April 2, 2020 and April 3, 2020.[117] Because her complaint was filed on March 12, 2021, she argues that "at a very minimum," her battery claim for these instances are not prescribed.[118] Furthermore, Bergeron argues that the "continuing tort doctrine" is an exception to prescription that applies "when continuous tortious conduct causes continuing damages."[119] Bergeron contends that this doctrine requires: (1) a continuing duty owed to a plaintiff; (2) a continuing breach of that duty by a defendant; and (3) that a continuing injury or damages arises day to day.[120] Because Bergeron "continued to be

---

[114] *Id.*

[115] *Id.* at 19.

[116] *Id.*

[117] *Id.* at 21.

[118] *Id.*

[119] *Id.*

[120] *Id.*

damaged and exposed to seafood month after month," she argues that her claim has not prescribed.[121]

Furthermore, Bergeron argues that battery does not require malicious intent, and that it is sufficient if the defendant "intends to inflict either a harmful or offensive contact without the other's consent."[122] Bergeron contends that Guy "intended to inflict offensive contact by making seafood a large part of her diet while working with Bergeron."[123]

Lastly, Bergeron argues that LCMC is vicariously liable because the "breaks in which the seafood was eaten [were] highly regulated as set forth in LCMC's policies."[124] Bergeron further contends that because lunch breaks are required by LCMC policy and occurred on the premises during work hours, LCMC is vicariously liable for the battery she sustained by being exposed to seafood.[125]

## C.   LCMC's Arguments in Further Support of the Motion

### 1.   Failure to Accommodate

In reply, LCMC maintains that it did not know of Bergeron's disability or its limitations until the September 2019 incident.[126] LCMC contends that prior to that incident, Bergeron had disclosed only an allergy, not a disability or any limitations.[127] LCMC further argues that its

---

[121] *Id.*

[122] *Id.*

[123] *Id.* at 23.

[124] *Id.*

[125] *Id.* at 24.

[126] Rec. Doc. 41 at 2.

[127] *Id.*

obligation to participate in the interactive process was not triggered until Bergeron requested an accommodation.[128] LCMC contends that Bergeron's disclosure of her seafood allergy did not trigger this obligation.[129]

LCMC further argues that once Bergeron made a request for an accommodation, the evidence demonstrates that LCMC immediately took steps to implement a reasonable accommodation.[130] Furthermore, LCMC contends that the accommodation it adopted was not ineffective.[131] LCMC argues that Bergeron did not report any allergic reactions between September 2019 and January 2020, and that her January 15, 2020 reaction was not severe.[132] Furthermore, LCMC argues that there is no evidence that Bergeron had to miss work due to these exposures, and notes that her employment records show a total of only eight hours of time off on days that do not correspond to dates where Bergeron alleges she was exposed to seafood.[133]

## 2.     Retaliation

In further support of its argument that there was no causal connection between any protective activity and Bergeron's firing, LCMC argues that there is no evidence that Guy was aware of Bergeron's protected activities, and thus there is no causal link between those activities and Guy's reporting that Bergeron stole masks.[134] Furthermore, LCMC argues that there is no

---

[128] *Id.*

[129] *Id.*

[130] *Id.* at 4.

[131] *Id.* at 5.

[132] *Id.* at 5–6.

[133] *Id.* at 7.

[134] *Id.* at 8.

evidence that Guy influenced the termination decision.[135] LCMC contends that Millet and Ballard, who ultimately terminated Bergeron's employment, did so after independently reviewing the video recordings and questioning Bergeron herself.[136]

### III. Legal Standard

Summary judgment is appropriate when the pleadings, discovery, and affidavits demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[137] To decide whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[138] All reasonable inferences are drawn in favor of the nonmoving party.[139] Yet "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[140] If the entire record "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists and, consequently, the moving party is entitled to judgment as a matter of law.[141] The nonmoving party may not rest upon the pleadings.[142] Instead, the nonmoving

---

[135] *Id.*

[136] *Id.*

[137] Fed. R. Civ. P. 56(a); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[138] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[139] *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000))

[140] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[141] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[142] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

party must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[143]

The party seeking summary judgment always bears the initial responsibility of showing the basis for its motion and identifying record evidence that demonstrates the absence of a genuine issue of material fact.[144] "To satisfy this burden, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element of the opponent's claim or defense."[145] If the moving party satisfies its initial burden, the burden shifts to the nonmoving party to "identify specific evidence in the record, and to articulate" precisely how that evidence supports the nonmoving party's claims.[146] The nonmoving party must set forth "specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."[147]

The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory

---

[143] *See id.*; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[144] *Celotex*, 477 U.S. at 323.

[145] *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir. 1991) (quoting *Little*, 939 F.2d at 1299).

[146] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

[147] *Morris*, 144 F.3d at 380; *see also Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).

allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[148] Moreover, the nonmoving party may not rest upon mere allegations or denials in its pleadings.[149]

## IV. Analysis

The Amended Complaint asserts claims for (1) failure to accommodate; (2) retaliation; and (3) battery. LCMC seeks summary judgment on each of these claims. The Court will address each in turn.

### A.    Whether LCMC is Entitled to Summary Judgment on Bergeron's Failure to Accommodate Claim

Title 42, Section 12112 of the United States Code provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[150] "[T]he term 'discriminate against a qualified individual on the basis of disability' includes . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."[151] To establish a prima facie claim for failure to accommodate, a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations.[152]

---

[148] *Little*, 37 F.3d at 1075 (internal citations omitted).

[149] *Morris*, 144 F.3d at 380.

[150] 42 U.S.C. § 12122(a).

[151] 42 U.S.C. § 12122(b)(5)(A).

[152] *Credeau v. Louisiana*, 860 F.3d 785, 792 (5th Cir. 2017).

Here, LCMC concedes that Bergeron is a "qualified individual with a disability."[153] LCMC further concedes that as of September 2019, when Bergeron requested an accommodation, LCMC had a duty to provide a reasonable accommodation.[154] However, the parties dispute whether LCMC knew of Bergeron's disability and its limitations prior to September 2019. The Fifth Circuit has made clear that "[a]n employee who needs an accommodation because of a disability has the responsibility of informing her employer."[155] Although the employee need not "mention the ADA or use the phrase 'reasonable accommodation,'" "[t]he employee must explain that the adjustment in working conditions or duties she is seeking is for a medical condition-related reason."[156] "[W]here the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations."[157] However, "[o]nce an employee makes such a request . . . the employer is obligated by law to engage in an 'interactive process': 'a meaningful dialogue with the employee to find the best means of accommodating that disability.'"[158] Although Bergeron has offered evidence that she informed LCMC of her *allergy* during the hiring process, it is undisputed that her first request for an accommodation was in September 2019. The parties further agree that as of September 2019, LCMC was required to make a reasonable accommodation for Bergeron's

---

[153] Rec. Doc. 32-1 at 11 n. 69.

[154] *Id.* at 12.

[155] *EEOC v. Chevron Phillips Chem. Co.,* 570 F.3d 606, 621 (5th Cir. 2009).

[156] *Id.*

[157] *Id.* (quoting *Taylor v. Principal Fin. Group*, 93 F.3d 155, 165 (5th Cir. 1996)).

[158] *Id.* (quoting *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108 (1st Cir. 2006).

seafood allergy. Thus, the relevant inquiry is whether LCMC did so after September 2019.

LCMC argues that it provided Bergeron a reasonable accommodation. In support of the reasonableness of its accommodation, LCMC highlights an email from Young to LCMC employees explaining that LCMC was implementing the following protocol for Bergeron's safety:

- Limit Seafood exposure during shifts in which Myrell is working
    - If eating seafood in breakroom, the door should be closed with sign stating "Seafood Present"
- Food containers containing seafood should be stored in a closed container in the Refrigerator
- Eating areas including Microwaves should be kept clean; if seafood was present in area, please wipe areas with Saniwipes.[159]

LCMC further suggests that Bergeron agreed to this accommodation, pointing to her deposition testimony where she stated that she told Malveaux and Young "well, let's just see if this works."[160] LCMC argues that following the adoption of this accommodation, Bergeron only had one other potential exposure to seafood, which occurred on January 15, 2020.[161] LCMC points to evidence that, with respect to that incident, employees followed the accommodation protocol, and that any symptoms Bergeron suffered were minor as she remained at work the entire day and did not seek treatment for nearly a week.[162]

In response, Bergeron disputes that the accommodation was reasonable because, according to Bergeron, the accommodation did not work.[163] Bergeron argues that she had more than one

---

[159] Rec. Doc. 32-5 at 12–13.

[160] Rec. Doc. 32-3 at 11.

[161] Rec. Doc. 32-6 at 5, 63–73.

[162] *Id.*

[163] Rec. Doc. 35 at 10.

allergic reaction following LCMC's adoption of the accommodation.[164] Bergeron offers evidence that she had allergic reactions on January 15, 2020 and on February 21, 2020.[165] Bergeron contends that there is no evidence that there were any changes, nor discussions about changes, to the accommodation in response to these additional incidents.[166]

The ADA does not provide a precise definition for "reasonable accommodation," but rather "illustrates the term with [the following] non-exclusive list of examples:"[167]

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.[168]

"The ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation."[169] "When a qualified individual with a disability requests a reasonable accommodation, the employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation."[170] "[W]hen an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the

---

[164] *Id.* at 13.

[165] Rec. Doc. 35-5; Rec. Doc. 32-6 at 63. In addition, Bergeron argues that she was exposed to seafood on April 2, 2020 and April 3, 2020. However, Bergeron does not provide evidence of this, and instead cites the allegations in the amended complaint. Rec. Doc. 35 at 14, n.69.

[166] Rec. Doc. 35 at 13.

[167] *Jones v. Lubbock Cnty. Hosp. Dist.*, 835 Fed. App'x 923, 926 (5th Cir. 2020)

[168] 42 USC 12111(9)

[169] *Griffin*, 661 F.3d at 224 (quoting *EEOC v. Agro Distrib.*, 555 F.3d 462, 471 (5th Cir. 2009)).

[170] *Id.* (quoting *Agro Distrib.*, 555 F.3d at 471).

employer violates the ADA."[171] The Fifth Circuit has recognized that "[w]hether a proposed accommodation is reasonable is generally a fact issue."[172]

Viewing the evidence in the light most favorable to Bergeron, the Court finds that there is a genuine dispute of material fact as to whether the LCMC's accommodation was reasonable. Bergeron has presented evidence that she had at least two allergic reactions at work due to seafood exposure despite the accommodations adopted by LCMC—one on January 15, 2020, and one on February 21, 2020. LCMC responds by pointing to circumstantial evidence that the January 15, 2020, exposure was not severe, such as medical records indicating that Bergeron did not seek medical treatment for six days, that her symptoms had subsided by the time she did so, and that she did not use her epi-pen which she only uses for more severe reactions.[173] With respect to the February 21, 2020 incident, LCMC does not respond specifically. Instead, LCMC claims that "there is no evidence that Bergeron reported any exposures other than in September 2019 and January 2020."[174] However, Bergeron attaches a February 25, 2020, email to Lambert, LCMC's Employee Health Coordinator, stating as follows:

> Ms. Bergeron stated she had another seafood exposure 02/21/20 at work. Ms. Bergeron stated she has tightness in her throat, a cough, and bad congestion. Ms. Bergeron is schedule for an appointment with Dr. Garg 02/27/20.[175]

---

[171] *Id.* (quoting *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999)).

[172] *Jones*, 834 Fed. App'x at 926 (citing *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 683 (5th Cir. 1996). *See also Alford v. Teleplex, Inc.*, 95 F.3d 48 at *2 (5th Cir. 1996) (citing *Brennan v. Stewart*, 834 F.2d 1248 (5th Cir. 1988)) ("Although in the ordinary case the trier of fact decides whether a suggested accommodation is reasonable, we conclude as a matter of law that under these facts no reasonable trier of fact could find such a reallocation of essential functions to be required by the ADA.")).

[173] Rec. Doc. 41 at 6; Rec. Doc. 32-6 at 66.

[174] Rec. Doc. 41 at 5. *See id.* ("The record actually reflects that the September 2019 and January 2020 incidents were the only incidents that were actually reported to Defendant.").

[175] Rec. Doc. 35-5. In an attachment to LCMC's reply brief, LCMC argues that evidence of this email should not be considered in deciding the motion for summary judgment because it was "not authenticated during Lambert's deposition, nor was there any attempt to authenticate it for purposes of Plaintiff's Opposition to Defendant's Motion

Thus, the record reflects that despite LCMC's accommodation, Bergeron suffered at least two more allergic reactions due to exposure to seafood at work. Bergeron has also noted that there is no evidence in the record that LCMC modified, or even discussed modifying, Bergeron's accommodation in light of these incidents.[176] The number of allergic reactions Bergeron suffered after the accommodation was adopted, and whether those reactions were sufficiently severe such that LCMC's failure to modify Bergeron's accommodation was unreasonable, is a genuine dispute of fact that the Court cannot decide on a motion for summary judgment. Therefore, LCMC is not entitled to summary judgment on Bergeron's failure to accommodate claim.

**B.    *Whether LCMC is Entitled to Summary Judgment on Bergeron's Retaliation Claim***

To establish a prima facie case of retaliation under the ADA, a plaintiff must show that (1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action.[177] If the plaintiff does so, "the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision."[178] After the employer states its reason, the burden shifts back to the plaintiff to demonstrate that the employer's reason is actually a pretext for retaliation, which the plaintiff accomplishes by showing that the adverse action would not have

---

for Summary Judgment." Rec. Doc. 41-1 at 10. However, LCMC overlooks that "[a]t the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form." *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017). Given that this evidence is capable of being authenticated at trial, it is proper summary judgment evidence.

[176] Rec. Doc. 35 at 13, 14.

[177] *Feist v. La. Dep't of Justice, Office of the Atty. Gen*., 730 F.3d 450, 454 (5th Cir. 2013) (citing *Seamon v. CSPH, Inc.*, 139 F.3d 297, 301 (5th Cir. 1999)).

[178] *Id.*

occurred 'but for' the employer's retaliatory motive.[179] "In order to avoid summary judgment, the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity."[180]

LCMC does not dispute that Bergeron engaged in a protected activity, but rather "assum[es] for the purposes of this motion only" that she did so.[181] Nevertheless, LCMC contends that there is no evidence of a causal connection between the protected activity and her termination regarding a "separate incident involving Bergeron indisputably taking N-95 masks that she knew to be in critically short supply for her own personal use."[182] Relatedly, even if there was a causal connection, LCMC argues that Bergeron's taking N-95 masks from the workplace was a legitimate, non-retaliatory reason for terminating her employment, and that Bergeron cannot show that this reason was pretextual.[183] In response, Bergeron argues that she can establish causation under a "cat's paw" theory because her supervisor, Guy, is the one who reported her for taking masks, and Guy allegedly had retaliatory animus.[184]

The Fifth Circuit has explained that "[p]laintiffs use a cat's paw theory of liability when they cannot show that the decisionmaker —the person who took the adverse employment action— harbored any retaliatory animus."[185] "Under this theory, a plaintiff must establish that the person

---

[179] *Id.*

[180] *Id.*

[181] Rec. Doc. 32-1 at 14.

[182] *Id.* at 15.

[183] *Id.* at 16.

[184] Rec. Doc. 35 at 16.

[185] *Zamora v. City of Hous.*, 798 F.3d 326, 331 (5th Cir. 2015).

with a retaliatory motive somehow influenced the decisionmaker to take the retaliatory action."[186] The Fifth Circuit has further explained that to establish retaliation under such a theory, a plaintiff must show that (1) her supervisor, motivated by retaliatory animus, took acts intended to cause an adverse employment action; and (2) those acts were a "but for" cause of the adverse employment action.[187]

The Court notes at the outset that the parties' briefing is not clear as to how the "cat's paw" theory of liability fits into the *McDonnell Douglas* burden shifting framework governing the Court's analysis. LCMC relies on Bergeron's taking of N-95 masks as evidence that Bergeron cannot establish the causation element of her prima facie case and also that LCMC had a legitimate, non-retaliatory reason for terminating her employment. Other courts have noted that there is a "doctrinal tension" between *McDonnell Douglas* and the cat's paw theory of liability.[188] However, the Fifth Circuit has suggested that the "cat's paw" theory is analyzed at the pretext stage.[189] Thus, the Court will consider whether Bergeron can show that LCMC's offered reason for terminating Bergeron—her taking of N-95 masks—was pretextual under the "cat's paw" theory.

As discussed, to demonstrate pretext based on the "cat's paw" theory, Bergeron must show that her "(1) supervisor[], motivated by retaliatory animus, took acts intended to cause an adverse employment action; and (2) those acts were a but-for cause of [her] termination."[190] Here,

---

[186] *Id.*

[187] *Id.* at 333.

[188] *Afrasiabipour v. Penn. Dep't of Transp.*, 469 F. Supp. 3d, 372, 386 (E.D. Pa. 2020) (collecting cases).

[189] *Melvin v. Barr Roofing Co.*, 806 Fed. App'x 301, 306 (5th Cir. 2020) ("At the pretext stage, a plaintiff may alternatively support but-for causation using the 'cat's paw' theory.")

[190] *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 758 (5th Cir. 2017).

Bergeron points to some evidence that her supervisor, Guy, had retaliatory animus when she reported Bergeron for taking the N-95 masks. Bergeron attaches a declaration from Toby Savoie, who worked at LCMC with Bergeron and Guy, stating that Guy made "negative comments about Myrell Bergeron because of her seafood restrictions."[191] The declaration further states that Savoie "witnessed Icessis Guy's annoyance for Myrell Bergeron's seafood accommodations."[192] On a motion for summary judgment, the Court "refrains from making credibility determinations or weighing the evidence"[193] and draws "all reasonable inferences . . . in favor of the nonmoving party."[194] Because there is some evidence that Guy had animus related to Bergeron's seafood allergy, a reasonable jury could conclude that Guy reported Bergeron's "theft" of five N-95 masks intending that the decisionmakers would terminate Bergeron's employment.[195] Therefore, Bergeron has demonstrated a genuine dispute of material fact as to the first requirement of her "cat's paw" theory of liability.

LCMC suggests that Guy's conduct was not the "but for" cause of Bergeron's termination because Millett and Ballard "initiated the N-95 mask investigation in response to Guy's report about missing masks" and "independently reached the termination decision after reviewing

---

[191] Rec. Doc. 35-18.

[192] *Id.* In an attachment to its reply brief, LCMC argues that the Court should disregard this declaration because it is not based on personal knowledge. The Court disagrees. The declaration states that Savoie worked with Bergeron and Guy at LCMC during the relevant time period, and that Savoie himself "witnessed Icesiss Guy make negative comments about Myrell Bergeron because of her seafood restrictions." *Id.* The declaration further states that Savoie "also witnessed Icessis Guy's annoyance for Myrell Bergeron's seafood accommodations." *Id.* Thus, the offered evidence of Guy's animus does appear to be based on Guy's personal knowledge.

[193] *Delta & Pine Land Co.*, 530 F.3d at 398–99.

[194] *Turner*, 476 F.3d at 343 (quoting *Reeves*, 530 U.S. at 150).

[195] *See Zamora*, 798 F.3d at 334 (explaining that the jury reasonably could have found that a supervisor's "highly negative statements" attacking the plaintiff's "credibility and reputation" "were intended to cause [the plaintiff] to suffer an adverse employment action").

indisputable video recordings and questioning Bergeron."[196] Bergeron argues, however, that "[b]ut for Ms. Guy's complaint to Pam Ballard advising that [Bergeron] had 'stolen masks,' Nick Millet and Pam Ballard (who were the decision makers) would not have terminated" Bergeron's employment.[197]

The Fifth Circuit has discussed the effect on a subsequent investigation by the ultimate decision maker as follows:

> Discussing the second prong, we noted that "an investigation that 'result[ed] in an adverse action for reasons unrelated to the ... [supervisors']' retaliatory statements" could be a superseding cause, breaking the causal chain. However, we emphasized that "if an independent investigation 'takes [a supervisor's biased report] into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified,' the supervisor's action 'may remain a causal factor.'"[198]

Here, there is no dispute that Millet and Ballard investigated the incident. LCMC provides evidence of a letter written by Millett for Bergeron's personnel file on April 20, 2020.[199] That letter noted that after Guy reported Bergeron, Ballard and Millet spoke with Guy about what she saw.[200] The letter recounts Guy's statements as follows:

> [Guy] explained that while she was going through the box of masks, she noticed one standalone mask sitting on the counter (the N95 masks come in a pack of 10). After she asked the group of employees within the nurses station where the rest of the N95 masks were, [Bergeron] started searching through some drawers. As [Guy] was walking down the hallway with the box of masks, she noticed [Bergeron] grab the missing N95 masks from her purse, and said that she found them and then

---

[196] Rec. Doc. 41 at 9.

[197] Rec. Doc. 35 at 20.

[198] *Fisher*, 857 F.3d at 758 (internal citations omitted).

[199] Rec. Doc. 32-6 at 109.

[200] *Id.*

proceeded to pass the masks out to the clinic employees.[201]

A second letter from Millett on April 22, 2020, recounts a meeting between himself, Ballard, Katie DiBenedetto, and Bergeron. It reads, in relevant part, as follows:

> I informed [Bergeron] that we had evidence that she took the pack of masks, and wanted to give her an opportunity to explain. [Bergeron] explained that she doesn't remember taking a pack of N95 masks, and that Dr. Cabrera gave her one mask to use. When I explained that we had video surveillance of [Bergeron] placing a pack of masks in her purse/bag, she said she didn't remember that. [Bergeron] confirmed that her personal bag is white with black straps, and she places the bag underneath her workstation. I also informed [Bergeron] that this was a serious company violation, and asked if she had any final questions, or if she could provide us with any additional information. [Bergeron] just stated that she doesn't remember taking any masks and if she did it, she did it unconsciously and would have to own it.
>
> After a brief meeting with [Ballard] and [DiBenedetto], the meeting continued. I reiterated to [Bergeron] that the company takes these types of infractions very seriously, and that we previously terminated other employees for similar instances of theft. I explained to [Bergeron] that her employment would be terminated effective immediately. [Bergeron] acknowledged, and the meeting ended.[202]

However, the mere fact that they conducted an investigation is not sufficient to defeat a retaliation claim based on a cat's paw theory. The Supreme Court rejected that approach in *Staub v. Proctor Hospital*, explaining that such a rule would render the employer "effectively shielded from discriminatory acts and recommendations of supervisors that were designed and intended to produce the adverse action."[203] Rather, the Supreme Court explained that the a "supervisor's biased report may remain a causal fact if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely

---

[201] *Id.*

[202] Rec. Doc. 32-6 at 110.

[203] *Staub*, 562 U.S. at 420.

justified."[204]

Here, the Court finds that there is a genuine dispute of material fact as to whether Millet and Ballard's decision to terminate Bergeron's employment was "entirely justified" "apart from" Guy's report that Bergeron stole the masks. As both parties acknowledge, LCMC policy states that "property theft [is] the unauthorized use of services or facilities or the taking of any property for personal use.[205] Bergeron attaches LCMC's corporate deposition, through Jared Ledoux, where, when asked to confirm the grounds for termination, he stated that "based on [Millett's] memo, it was termination due to theft."[206] Bergeron also attaches Millett's deposition, where when asked whether he believed Bergeron committed a theft, Millet stated that "[it] appears to be a misappropriation."[207] He further testified that he considered misappropriation to be "temporarily taking an object into your possession," but theft to be "that she would have took the object and walked out the door with it."[208] When asked whether Bergeron walked out the door with the masks, he replied "I didn't see it in this video, no."[209] Furthermore, when asked whether he had "any information that she was not [going to] use them for work," he answered "no."[210] Therefore, whether Millet and Ballard's conclusion that Bergeron had violated LCMC's theft policy was "entirely justified" apart form Guy's potentially biased reporting is a disputed issue of material

---

[204] *Id.* at 411.

[205] Rec. Doc. 32-6.

[206] Rec. Doc. 35-21 at 5.

[207] Rec. Doc. 35-12 at 15.

[208] *Id.*

[209] *Id.*

[210] Rec. Doc. 35-12.

fact that the Court cannot determine on a motion for summary judgment. Accordingly, LCMC is not entitled to summary judgment on the retaliation claim.

## C.      *Whether LCMC is Entitled to Summary Judgment on Bergeron's Battery Claim*

The Amended Complaint also asserts a claim for battery based on Bergeron's exposure to "seafood odor."[211] Under Louisiana law, a battery is "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact."[212] "The intention need not be malicious nor need it be an intention to inflict actual damage. It is sufficient if the actor intends to inflict either a harmful or offensive contact without the other's consent."[213] A defendant is liable "not only for contacts that do actual physical harm, but also for those relatively trivial ones which are merely offensive and insulting."[214] Furthermore, "[t]he intent with which tort liability is concerned is not necessarily a hostile intent, or a desire to do any harm. Rather it is an intent to bring about a result which will invade the interests of another in a way that the law forbids."[215] Thus, a defendant may be liable even when "intending nothing more than a good-natured practical joke, or honestly believing that the act would not injure the plaintiff, or even though seeking the plaintiff's own good."[216] A defendant's liability for harm extends "to consequences which the defendant did not intend, and could not reasonably have foreseen, upon the obvious basis that it is better for unexpected losses to fall upon the intentional wrongdoer than

---

[211] Rec. Doc. 11 at 12.

[212] *Caudle v. Betts*, 512 So. 2d 389, 391 (La. 1987).

[213] *Id.*

[214] *Id.*

[215] *Id.* (internal citation omitted).

[216] *Id.* (citing Prosser & Keeton, *The Law of Torts* § 9 (5th ed. 1984)).

upon the innocent victim."[217]

LCMC contends that it is entitled to summary judgment on this claim for numerous reasons. LCMC argues that the battery claim fails because: (1) it was not asserted within one year and thus has prescribed;[218] (2) there was no evidence of an intentional act;[219] and (3) LCMC cannot be vicariously liable for the conduct of its employees.[220] The Court need not address each of these, as the Court is satisfied that Bergeron has not offered any evidence that any LCMC employee had the requisite intent to support Bergeron's battery claim.

As discussed above, although a tortfeasor need not have the specific intent to cause harm, they must "intend[] to inflict either a harmful or offensive contact without the other's consent."[221] Thus, the contact itself must be intentional. Under Louisiana law, an act is intentional when the person "either consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct" or "knows that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result."[222] However, Bergeron has not offered any evidence to suggest that any employee brought seafood to work either consciously desiring that Bergeron would come in contact with it, nor with substantial certainty that this contact would occur. In response to LCMC's arguments that Bergeron could not establish the intent element of

---

[217] *Id.* at 392.

[218] Rec. Doc. 32-1 at 17.

[219] *Id.* at 18.

[220] *Id.* at 19.

[221] *Caudle*, 512 So. 2d at 391.

[222] *Larroquette v. Cadinahl Health 200, Inc.*, 466 F.3d 372, 376–77 (5th Cir. 2022).

her battery claim, Bergeron argued that the intent need not be malicious.[223] Although true, Bergeron must still offer some evidence that an LCMC employee intended for her to come in contact with the "seafood odor." Bergeron argues that Guy "intended to inflict offensive contact by making seafood a large part of her diet while working with Bergeron."[224] However, the only evidence in the record that Bergeron points to is an email she sent speculating that "she believe[s] this is on purpose," and asks "[w]hy do they do this[?] Do they want me to leave that bad?"[225]  But "unsupported allegations . . . setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to . . . defeat a motion for summary judgment."[226] Because Bergeron has not offered any evidence that Guy or any other employee intended for Bergeron to make contact with seafood, LCMC is entitled to summary judgment on her battery claim.

Alternatively, even if Bergeron suffered a battery, LCMC is entitled to summary judgment on this claim because LCMC cannot be held vicariously liable. The Louisiana Supreme Court has explained that "an employer is liable for a tort committed by his employee if, at the time, the employee was acting within the course and scope of his employment."[227] The employee's conduct must be "so closely connected in time, place, and causation to his employment duties as to be regarded as a risk of harm fairly attributable to the employer's business."[228] Although employers

---

[223] Rec. Doc. 32-1 at 22.

[224] Rec. Doc. 35 at 23.

[225] Rec. Doc. 35–8.

[226] *Galindo*, 754 F.2d at 1216; *Little*, 37 F.3d at 1075.

[227] *Baumeister v. Plunkett*, 95-2270 (La. 5/21/96); 673 So. 2d 994, 996.

[228] *Id.* (quoting *Barto v. Franchise Enters., Inc.*, 588 So. 2d 1353, 1356 (La. App. 2 Cir. 1992)).

can be liable for the intentional torts of their employees,[229] the Louisiana Supreme Court has made clear that "[a]n employer is not vicariously liable merely because his employee commits an intentional tort on the business premises during work hours."[230]

To determine whether an employer can be held vicariously liable, Louisiana courts look to the following factors: (1) whether the tortious act was primarily employment rooted; (2) whether the [tortious act] was reasonably incidental to the performance of the employee's duties; (3) whether the act occurred on the employer's premises; and (4) whether it occurred during the hours of employment.[231] Although not all four factors must be present to establish vicarious liability, "[t]he particular facts of each case must be analyzed to determine whether the employee's tortious conduct was within the course and scope of his employment."[232] Because the mere fact that an intentional tort is committed on the business premises during work hours is insufficient, one of the first two factors must be present.[233]

To determine whether the "employment rooted" factor is met, courts look to whether an employee's conduct was motivated "to any appreciable extent" by the "purpose of serving" the employer's business.[234] To determine whether the incidental-to-performance factor is met, courts look to whether the conduct was "instituted by purely personal consideration entirely extraneous

---

[229] *Benoit v. Capitol Mfg. Co.*, 617 So. 2d 477, 479 (La. 1993).

[230] *Baumeister*, 673 So. 2d at 997.

[231] *Id.* at 997–98 (citing *LeBrane v. Lewis*, 292 So. 2d 216, 218 (La. 1974)).

[232] *Id.* (citing *Scott v. Com. Union Ins. Co.*, 415 So. 2d 327, 329 (La. App. 2 Cir. 1982)).

[233] *See id.*

[234] *Id.* at 999 (quoting *Ermert v Hartford Ins. Co.*, 559 So. 2d 467, 476–77 (La. 1990)).

to the employer's interest," or instead whether it could be "regarded as a risk of harm fairly attributable to the employer's business."[235]

Here, it is undisputed that Bergeron's contact with seafood occurred at the workplace during work hours. However, as discussed above, "[a]n employer is not vicariously liable merely because his employee commits an intentional tort on the business premises during work hours."[236] Bergeron must also show either that: (1) the tortious act was primarily employment rooted; or (2) the tortious act was reasonably incidental to the performance of the employee's duties.[237] Bergeron has made no such showing. Bergeron asserts that the battery was "employment rooted" because the "breaks in which the seafood was eaten [were] highly regulated" by LCMC, and that her exposure was "reasonably incidental to performance of the lunch breaks."[238] However, the fact that LCMC policy permitted employees to take meal breaks does not mean that any act committed during such a break was "employment rooted" or "reasonably incidental" to employee's duties. Bergeron does not cite any authority in support of this novel application of the vicarious liability doctrine. Nevertheless, even if employees intended to cause Bergeron to come in contact with seafood, Plaintiff has not presented any evidence to show that this conduct was not "employment rooted" nor "reasonably incidental" to their duties. To hold otherwise would render LCMC vicariously liable merely because a tort was committed at the worksite during work hours. Therefore, LCMC is entitled to summary judgment on Bergeron's battery claim.

---

[235] *Id.* at 997 (citing *Faust v. Mendoza*, 415 So. 2d 371, 374–75 (La. App. 1 Cir. 1982)).

[236] *Id.*

[237] *Id.*

[238] Rec. Doc. 35 at 23–24.

## V. Conclusion

Based on the foregoing,

**IT IS HEREBY ORDERED** that LCMC's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** to the extent that it seeks dismissal of Bergeron's battery claim. The motion is denied in all other respects.

**NEW ORLEANS, LOUISIANA**, this 26th day of April, 2022.

_Nannette Jolivette Brown_
**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

38